[Cite as *Matthews v. Springfield-Clark CTC Bd. of Edn.*, 2023-Ohio-1304.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

JAMES PAT MATTHEWS           :

     Appellee              :    C.A. No. 2022-CA-64

v.                        :    Trial Court Case No. 21-CV-0093

SPRINGFIELD-CLARK CTC BOARD    :    (Civil Appeal from Common Pleas
                                :    Court)

     Appellant              :

                                :

. . . . . . . . . . .

O P I N I O N

Rendered on April 21, 2023

. . . . . . . . . . .

NIROSHAN M. WIJESOORIYA & JEFFREY M. SILVERSTEIN, Attorneys for Appellee

BRIAN L. WILDERMUTH & TABITHA JUSTICE, Attorneys for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant Springfield-Clark CTC Board of Education ("Board") appeals from a judgment reversing the Board's termination of Appellee James Pat Matthews and awarding Matthews back pay. The Board asserts these grounds of error: (1) the trial court incorrectly found that due process protections given to Matthews violated

fundamental fairness; (2) the court failed to defer to the Board's factual findings, improperly substituted its judgment for that of the Board, and applied the wrong standard for terminating nonteaching contracts; (3) the court erred as a matter of law when it awarded Mathews lost wages in an appeal brought under R.C. 3319.081; (4) lost wages were inappropriate because Matthews failed to submit anything other than a rough estimate of wages; and (5) lost wages were also inappropriate because Matthews failed to mitigate his damages.

{¶ 2} After reviewing the record, we conclude that the trial court erred in finding that the Board had violated fundamental fairness and due process. The court also incorrectly failed to accord any deference to the Board's findings and blatantly substituted its judgment for that of the Board. Given these conclusions, the rest of the Board's assignments of error are moot. Accordingly, the trial court's judgment will be reversed, and pursuant to our authority under App.R. 12(B), the case will be remanded to the trial court with instructions to affirm the Board's decision to terminate Matthews.

I.   Facts and Course of Proceedings

{¶ 3} On April 1, 2021, Matthews filed an administrative appeal from the Board's notice that it had passed a resolution terminating Matthews from his nonteaching contract as a custodial supervisor, effective March 24, 2021. The stated grounds were dishonesty, insubordination, misfeasance, and malfeasance.

{¶ 4} Subsequently, the Board filed the transcript of its March 24, 2021 hearing, together with the exhibits offered during the hearing. After the Board filed an answer,

the parties submitted briefs outlining their positions. The trial court then issued a decision on October 25, 2021, finding the decision to terminate Matthews unreasonable and unsupported by a preponderance of evidence in the record. Entry (Oct. 25, 2021) ("Entry 1"), p. 6. The court also ordered the Board to reinstate Matthews to his position as supervising custodian and to pay him lost wages and benefits. *Id.*

{¶ 5} On January 21, 2022, the Board filed a motion for a hearing on damages and a motion to stay the order requiring reinstatement. In the motion, the Board noted that it could not appeal the trial court's decision absent a final order that included damages; the Board also requested a stay for the same reason. On March 23, 2022, the court overruled the motion for a stay and set a damages hearing for May 16, 2022.

{¶ 6} The Board then filed a combined summary judgment and liminal motion, seeking to preclude Matthews's lost wage recovery for two reasons: (1) R.C. 3319.081 does not authorize courts to award back pay or damages; and (2) Matthews failed to mitigate his damages. Matthews replied to the motion on May 9, 2022. On May 17, 2022, the court granted Matthews's previously filed request to continue the damages hearing.

{¶ 7} On June 17, 2022, Matthews filed a copy of the mandamus action he had filed the same day. The mandamus action bore a stamped case number of Clark County C.P. No. 22CA0043 and a case number of 21CV0093 (the number for the current case), written below in ink. The trial court never formally consolidated the cases, however.

{¶ 8} On June 24, 2022, the court set a damages hearing for July 15, 2022. The court then denied the Board's summary judgment motion as untimely, because the Board

failed to seek leave to file the motion. In addition, the court denied the liminal motion, finding that the Board could not preclude Matthews from presenting evidence of damages at a damages hearing. Based on the parties' joint request, the court reset the damages hearing for August 19, 2022.

{¶ 9} After the hearing, the court issued a decision on August 29, 2022, awarding Matthews $58,486.68 in damages. Shortly thereafter, Matthews filed a motion asking the court to order the Board to immediately reinstate him to his position. The court granted this motion on September 7, 2022. Two days later, the Board requested that the court stay its decisions ordering reinstatement and damages pending appeal. The Board followed this by filing a September 13, 2022 notice of appeal from the court's decisions. On the same day, the trial court refused to rule on the Board's motion because the court had relinquished jurisdiction due to the appeal.

{¶ 10} On September 23, 2022, the Board filed a motion in this appeal, seeking a stay of the trial court's decisions, and Matthews filed a memorandum opposing the stay. We then granted the Board's motion for a stay. *See Matthews v. Springfield-Clark CTC Bd. of Edn.*, 2d Dist. Clark No. 2022-CA-64 (Order, Oct. 4, 2022).

## II. Due Process

{¶ 11} The Board's first assignment of error states that:

The Trial Court Erred as a Matter of Law in Finding that the Due Process Protections Afforded Matthews "Violated Fundamental Fairness."

{¶ 12} Under this assignment of error, the Board argues that the trial court erred in

finding that the Board's actions violated fundamental fairness. According to the Board, Matthews was given all required statutory and constitutional due process protections. In addition, the Board contends that the court erroneously required it to give Matthews a "presumption of innocence." Before addressing these points, we will briefly outline the standards that apply.

## A. Applicable Standards

{¶ 13} R.C. 3319.081 pertains to nonteaching employees, who receive the status of continuing employees after they have been employed for the required number of years. *See* R.C. 3319.081(B). There is no dispute here that Mathews had been an employee for the necessary period.

{¶ 14} Concerning termination of nonteaching employees, R.C. 3319.081(C) states that:

> The contracts as provided for in this section may be terminated by a majority vote of the board of education. Except as provided in sections 3319.0810 and 3319.172 of the Revised Code, the contracts may be terminated only for violation of written rules and regulations as set forth by the board of education or for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, or any other acts of misfeasance, malfeasance, or nonfeasance.

{¶ 15} The specified exceptions (R.C. 3319.0810, related to termination of

transportation staff, and R.C. 3319.172, related to allowing reasonable nonteaching employee reduction for matters like financial reasons or declining enrollment) do not apply here. Therefore, the pertinent consideration is whether any statutorily-listed grounds for discharge exist.

{¶ 16} Appeals of school board decisions under R.C. 3319.081 are brought under R.C. Chap. 2506 because R.C. 3319.081 lacks a statutory procedure for appeals. *See Robinson v. Springfield Local School Dist. Bd. of Edn*., 144 Ohio App.3d 38, 42, 759 N.E.2d 444 (9th Dist.2001), citing *Kiel v. Green Local School Dist. Bd. of Edn*., 69 Ohio St.3d 149, 630 N.E.2d 716 (1994), paragraph one of the syllabus. *See also McGlinch v. Greenville City School Dist*., 2d Dist. Darke No. 2009 CA 13, 2010-Ohio-2924, ¶ 9.

{¶ 17} As relevant here, R.C. 2506.04 states that:

If an appeal is taken in relation to a final order, adjudication, or decision covered by division (A) of section 2506.01 of the Revised Code, the court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record. Consistent with its findings, the court may affirm, reverse, vacate, or modify the order, adjudication, or decision, or remand the cause to the officer or body appealed from with instructions to enter an order, adjudication, or decision consistent with the findings or opinion of the court.

{¶ 18} The Supreme Court of Ohio has said that while the common pleas court

proceeding is not a "de novo" hearing, it often resembles one because " 'R.C. 2506.03 specifically provides that an appeal pursuant to R.C. 2506.01 "shall proceed as in the trial of a civil action," and makes liberal provision for the introduction of new or additional evidence.' " *Dudukovich v. Lorain Metropolitan Hous. Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979), quoting *Cincinnati Bell, Inc. v. Glendale*, 42 Ohio St.2d 368, 370, 328 N.E.2d 808 (1975).

{¶ 19} Furthermore, because " 'R.C. 2506.04 requires the court to examine the "substantial, reliable and probative evidence on the whole record," which in turn necessitates both factual and legal determinations, * * * the function of a Court of Common Pleas in a R.C. Chapter 2506 appeal differs substantially from that of appellate courts in other contexts.' " *Id.*, quoting *Cincinnati Bell* at 370.

{¶ 20} In *Dudukovich*, the court also stressed that:

Thus, it is quite evident that the Court of Common Pleas must weigh the evidence in the record, and whatever additional evidence may be admitted pursuant to R.C. 2506.03, to determine whether there exists a preponderance of reliable, probative and substantial evidence to support the agency decision. We caution, however, to add that this does not mean that the court may blatantly substitute its judgment for that of the agency, especially in areas of administrative expertise. The key term is "preponderance." If a preponderance of reliable, probative and substantial evidence exists, the Court of Common Pleas must affirm the agency decision; if it does not exist, the court may reverse, vacate, modify or

remand.

*Id.*

{¶ 21} The Supreme Court of Ohio has also said that the grounds for reversal in R.C. 2506.04 "are set forth in a disjunctive list, so each ground must be read to have a distinct meaning." *Shelly Materials, Inc. v. Streetsboro Planning & Zoning Comm.*, 158 Ohio St.3d 476, 2019-Ohio-4499, 145 N.E.3d 246, ¶ 12, citing *Freedom Rd. Found. v. Ohio Dept. of Liquor Control*, 80 Ohio St.3d 202, 205, 685 N.E.2d 522 (1997). "The presence of any one of the six grounds listed in R.C. 2506.04 will therefore by itself justify a court of common pleas' reversal of an administrative order." *Id.* In other words, courts may reverse administrative orders, for example, by finding them illegal; there is no need to find that any other ground for reversal in R.C. 2506.04 applies.

{¶ 22} In contrast to a trial court's role, "the standard of review for an appellate court reviewing a judgment of a common pleas court in this type of appeal is narrower and more deferential to the lower court's decision." *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 25, citing *Kisil v. City of Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984). In *Cleveland Clinic*, the court remarked that it had, in fact, "stressed that the 'standard of review to be applied by the courts of appeals in an R.C. 2506.04 appeal is "*more limited in scope*." ' " (Emphasis sic.) *Id.*, quoting *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147, 735 N.E.2d 433 (2000), which in turn quotes *Kisil* at 34. Consequently, courts of appeal "may review the judgments of the common pleas courts only on questions of law; they do not have the same power to weigh the evidence." *Id.*

{¶ 23} In considering the proper focus of appellate courts, *Cleveland Clinic* further said that:

> As we have emphasized, R.C. 2506.04 requires the court of appeals to affirm unless the court of appeals finds, as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative, and substantial evidence. The appellate court in this case thus reviewed the wrong decision. It found that the BZA's resolution was properly supported by the requisite quantum of evidence. It should have applied that standard to the decision of the common pleas court.

*Cleveland Clinic* at ¶ 27.

{¶ 24} "Apart from deciding purely legal issues, the court of appeals can determine whether the court of common pleas abused its discretion, which in this context means reviewing whether the lower court abused its discretion in deciding that an administrative order was or was not supported by reliable, probative, and substantial evidence." *Shelly Materials*, 158 Ohio St.3d 476, 2019-Ohio-4499, 145 N.E.3d 246, at ¶ 18, citing *Boice v. Ottawa Hills*, 137 Ohio St.3d 412, 2013-Ohio-4769, 999 N.E.2d 649, ¶ 7. (Other citation omitted.) " '(1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.' " *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 39, quoting *Our Place, Inc. v. Ohio Liquor*

*Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992).

{¶ 25} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 26} With these standards in mind, we turn to the merits of the Board's claim.

## B.  Merits of Due Process Claim

{¶ 27} As noted, the Board contends the trial court incorrectly found that the Board's actions violated fundamental fairness and that the Board was required to afford Matthews with a presumption of innocence. The court's decision, as relevant here, states that:

> Before the Court addresses these allegations [as to Matthews's violations] individually, it finds that [the Board's] internal investigation violated fundamental fairness. While this is not a criminal proceeding, one of the basic tenants of our justice system is the presumption of innocence. A person accused of an act is to be presumed innocent unless or until the accuser overcomes the presumption with sufficient proof. The burden of proof rests with the accuser and not the accused. However, the accuser

in this case [the Board], did not assume the burden of proving misconduct, but instead shifted to [Matthews] the burden of disproving misconduct. This unfair approach was exposed in the last sentence under the first bullet point on page two (2) of the March 17. 2021 Notice, where the Superintendent wrote, "Therefore, the allegation of misconduct involved in this particular incident has not been disproven, and this has been determined to be an act of malfeasance."  The Court recognizes this statement was made specifically in reference to the office trespass allegation, but it reveals a general attitude and approach that appears to have permeated the entire investigation and hearing, thereby tainting both.

Entry 1 at p. 2.

{¶ 28} "A procedural-due-process challenge concerns the adequacy of the procedures employed in a government action that deprives a person of life, liberty, or property." *Ferguson v. State*, 151 Ohio St.3d 265, 2017-Ohio-7844, 87 N.E.3d 1250, ¶ 42.  The Supreme Court of Ohio has recognized that "an 'essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." ' "  *Stewart v. Lockland School Dist. Bd. of Edn.*, 144 Ohio St.3d 292, 2015-Ohio-3839, 42 N.E.3d 730, ¶ 11, quoting *Cleveland Bd. of Edn. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).  (Other citation omitted.)  Thus, a " 'tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.' "  *Id.*, quoting

*Loudermill* at 546. However, "the pretermination 'hearing,' though necessary, need not be elaborate." *Loudermill* at 545. "*Loudermill* * * * does require that a state employee be given notice of *all* grounds for a potential termination so that he may tell his side of the story prior to being discharged." (Emphasis sic.) *Arnett v. Franklin Monroe Local Bd. of Edn.*, 2d Dist. Darke No. 1567, 2002 WL 1483149, *4 (July 12, 2002).

{¶ 29} "Confrontation and cross-examination are not, however, absolute prerequisites to predeprivation due process." *Ohio Assn. of Pub. School Emps., AFSCME, AFL-CIO v. Lakewood City School Dist. Bd. of Edn.*, 68 Ohio St.3d 175, 177, 624 N.E.2d 1043 (1994). Even in post-termination proceedings, the court declined "to hold that face-to-face confrontation, while an important aspect of the truth-seeking process, is an absolute requirement of due process." *Id.* at 179. The court expressed its reasoning as follows:

> In the case at bar, we note first that it is a civil, and not criminal, matter. *Although Johnson's right to continued employment is undeniably a significant one, it is less compelling than the rights one stands to lose in a criminal prosecution.* Furthermore, Johnson's "confrontation right" emanates not from the Ohio or federal constitutional Confrontation Clauses, but from the aspect of procedural due process that guarantees a meaningful truth-seeking proceeding. Due process does not incorporate the entire arsenal of express constitutional protections that might apply in other situations.

(Emphasis added.) *Ohio Assn. of Pub. School Emps.* at 179-180. In view of these

comments, the trial court's imposition of criminal standards and burdens was not supported by sound reasoning.

**{¶ 30}** Our review of the record reveals that Matthews received all required procedural due process. Before the Board's formal hearing and termination, Matthews attended a pre-discipline meeting with the CTC superintendent, Michelle Patrick, who also gave Matthews written notice that she was recommending termination to the Board. Patrick's letter was quite detailed and informed Matthews of the specific grounds for termination. Matthews then received a hearing before the Board, where he was represented by an attorney, was allowed to examine any witnesses, and had the opportunity to present his side of events. In addition, Matthews had the ability to appeal the Board's decision under R.C. Chap. 2506, where he could have presented additional evidence in certain circumstances.

**{¶ 31}** According to the record, Matthews had been employed by the Board as a full-time custodian since 2006 and had been a supervisor since 2013. Executive Session Transcript ("Tr."), p. 48 and 80. As a supervisor, Matthews performed custodial work and supervised other workers. In the course of his supervisory duties, Matthews was responsible for maintaining confidentiality of protected documents and for his own decisions and conduct. *Id.*

**{¶ 32}** During the fall of 2020, issues arose regarding the conduct of Dave Foster, a night-time custodian that Matthews supervised. The Board fired Foster because he had taken photos of documents and had removed documents from the desk of Dave Saunders, who was CTC's Custodian and Maintenance Supervisor (and also Matthews's

supervisor).  *Id.* at p. 10 and 70.   The photos were of Saunders's log, which contained information about employee performance of tasks.   Foster had refused to tell who took the photos or who had texted photos to him.   *Id.* at p. 70-71.

{¶ 33} In light of this situation, CTC subsequently conducted an investigation using the services of Educational Services Center ("ESC").   As part of its investigation, ESC viewed videos taken from September 1, 2020, through December 30, 2020.   The videos were taken by a camera located in Saunders's office.   (ESC Notice of Outcome and Recommendation from Internal Investigation ("ESC Report"), p. 1.   During the investigation, ESC also interviewed ten employees who had either entered Saunders's office or who may have known of personnel who entered the office when Saunders was absent.   *Id.*   These employees included Matthews.   *Id.*   While ESC conducted its investigation, Matthews was placed on paid administrative leave, effective January 21, 2021.   *See* March 17, 2021 Letter from Michelle Patrick, CTC Superintendent ("Patrick Letter"), p. 1.

{¶ 34} According to the ESC Report:

Inconsistencies with video footage and interview questions/answers occurred with Mr. Pat Matthews.   Mr. Matthews exhibited a pattern of behavior of frequently entering Mr. Saunders' office when Mr. Saunders was not present, and he often entered the office multiple times in the same evening.   Mr. Matthews' behavior included looking in a bag on the chair behind the desk, placing papers on the desk, looking at objects on the side of the desk by the wall.   On one occasion, Mr. Matthews was in the office

with Mr. Dave Foster and they were looking at a notepad on the desk.   Mr.

Matthews proceeded to lift pages of the notepad.

ESC Report at p. 1.

{¶ 35} The report also identified several inconsistencies between Matthews's statements and either the videos or statements of others.   *Id.* at p. 2.   Based on the investigation, ESC found that "Matthews engaged in unprofessional conduct and did enter Mr. Saunders' office multiple times with no just cause."   *Id.*   ESC further stated that Matthews "did participate in unauthorized activities by entering the office, looking at papers and notepads on Mr. Saunders' desk, sharing that information with another employee who was in the office with him and by removing a paper."   *Id.*   In addition, ESC stated that "Matthews also provided inconsistent and erroneous information during his interview."   *Id.*   Moreover, the report listed five instances where Matthews's statements were contradicted by video or by other people.   *Id.*

{¶ 36} ESC therefore recommended that disciplinary action be taken against Matthews and made other recommendations for security protocol, a cleaning checklist, and professional learning opportunities for the custodial staff and supervisors.   *Id.* at p. 2-3.

{¶ 37} After receiving ECS's report, Patrick held a pre-discipline hearing on February 19, 2021, to decide if Matthews had been "involved in the suspected acts of dishonesty, insubordination, misfeasance, and/or malfeasance."   Patrick Letter at p. 1. After this meeting, Patrick noted additional inconsistencies in Matthews's responses and found, based on her review of the record, that Matthews had "engaged in dishonesty,

insubordination, misfeasance and malfeasance" and "had shown poor judgment by engaging in conduct which has created campus safety and/or security risks for the Center." *Id.*

{¶ 38} Patrick's letter also recited specific reasons for her findings and conclusions. *Id.* at p. 1-2. These included: (1) Matthews's explanation of why he was in Saunders's office on November 16, 2020 (bringing walkie-talkies back to charge) was not borne out by other evidence; (2) Matthews failed to explain why he was in Saunders's officer on December 7, 2020, without apparent purpose; (3) Matthews's denial of watching any surveillance videos of Saunders's office during the school year, which was inconsistent with the investigation report; (4) the fact that Matthews gave a non-employee substitute custodian a set of "substitute keys" and Matthews's own key code to disarm the facilities in violation of procedure and his supervisor's own directive to change the key code so the substitute did not have access to the buildings; (5) the fact that Matthews's account on this point differed from that of his supervisor, Saunders; (6) Matthews's failure to explain, as demonstrated by video and other evidence, why he and Foster were looking around Saunders's office and focusing on items on Saunders's desk; and (7) the compounding effect of a prior history of related disciplinary actions. Patrick Letter at p. 2-3.

{¶ 39} As a result, Patrick found good cause to terminate Matthews and notified him that she intended to recommend to the Board that he be terminated. Patrick further notified Matthews that a special public Board meeting would be held on March 24, 2021, that he would be provided a due process hearing either in executive session or in public,

and that he had a right to be represented by counsel. *Id.* at p. 3.

{¶ 40} Matthews appeared at the March 24 meeting and received a termination hearing that was held in executive session. He was represented by an attorney who presented testimony and examined witnesses. After the hearing, the Board unanimously voted to terminate Matthews, and he was informed of the decision as required by law.

{¶ 41} As indicated, there was no procedural due process deprivation. The trial court's remarks here appear to focus more on "substantive" issues, pointing to a lack of fundamental fairness in the entire proceeding. In fact, the court's decision specifically stated that the Board's "internal investigation and subsequent hearing violated fundamental fairness." Entry 1 at p. 2. However, this is simply part of procedural due process, which " 'also embodies the concept of fundamental fairness.' " *Urban v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 03AP-426, 2004-Ohio-104, ¶ 25, quoting *Sohi v. Ohio State Dental Bd.* 130 Ohio App.3d 414, 422, 720 N.E.2d 187 (1st Dist.1998).

{¶ 42} In considering a case brought under 42 U.S.C. 1983, our court noted a police officer's claim that a predeprivation hearing (which occurred before the termination hearing) was a "sham" and was insufficient to satisfy due process. *McDonald v. Dayton*, 146 Ohio App.3d 598, 767 N.E.2d 764, ¶ 16 and 24 (2d Dist.2001). This was based on an allegation that the decision-maker, the police chief, had decided before the predeprivation hearing to terminate the officer. *Id.* We found indications of possible bias because the police chief had condemned the officer's use of pepper spray. *Id.* at ¶ 27. In addition, we noted that the city and the police chief "were under considerable public pressure to avoid such conduct, which was alleged to arise from a racial bias and

poor management." *Id.* However, we rejected the due process violation, noting that this evidence "does not portray a resolve to terminate McDonald's employment that was so fixed and absolute as to render McDonald's hearing before Chief Lowe on July 21, 1998, a sham." *Id.*, citing *Wagner v. City of Memphis*, 971 F.Supp. 308, 314 (W.D.Tenn.1997).

{¶ 43} Although *McDonald* involved a due process claim under Section 1983, the analysis is apt. To the extent the trial court concluded that the investigation and administrative process were essentially a "sham" and fundamentally unfair, the court's conclusion was incorrect. Our review of the record fails to reveal *any* evidence that either the Superintendent or the Board was biased against Matthews or was unfair.

{¶ 44} Furthermore, the trial court's focus on the "presumption of innocence" afforded to criminal defendants misses the point. As we said, the Supreme Court of Ohio has stressed that while an employee's "right to continued employment is undeniably a significant one*, it is less compelling than the rights one stands to lose in a criminal prosecution.*" (Emphasis added.) *Ohio Assn. of Pub. School Emps.*, 68 Ohio St.3d at 179, 624 N.E.2d 1043. Likewise, the trial court's conclusion that the entire proceedings were tainted due to a stray remark about Matthews's failure to "disprove" a particular allegation is based on unsound reasoning. Entry 1 at p. 2, discussing Patrick's March 17, 2021 Letter. As noted, this was not a criminal proceeding. The only burden an employer has in this situation is to provide evidence of an employee's violations sufficient to justify termination; an employee's failure to offer any valid explanation in response to the allegation certainly supports the conclusion that a violation occurred.

{¶ 45} Based on the preceding discussion, we agree with the Board that the trial

court erred in concluding that the investigation and Board hearing violated fundamental fairness.   Accordingly, the first assignment of error is sustained.

III.   Improper Substitution of Court's Judgment for That of the Board.

{¶ 46} The Board's second assignment of error states that:

The Trial Court Failed to Give Deference to the Board of Education's Factual Findings, Improperly Substituted Its Own Judgment for That of the Board, and Applied the Wrong Standard for Termination of a Non-Teaching Contract.

{¶ 47} Under this assignment of error, the Board contends that the trial court erred in several ways, including failing to defer to the Board's factual findings, blatantly substituting its judgment for that of the Board, and applying an incorrect standard for terminating nonteaching contracts.   In evaluating the Board's claims, we have reviewed the entire record, including the transcript of the Board's March 24, 2021 executive session and the exhibits submitted to the Board, including Exs. A and B, which are contained on a CD.   After reviewing the record, we agree with the Board that the trial court improperly substituted its judgment for the Board's and that the court improperly gave no deference at all to the Board's findings.   In addition, the court's conclusions about the Board's investigation and conduct were not supported by sound reasoning.

{¶ 48} In discussing Matthew's discipline history and the grounds for termination, the trial court used terms like "feeble office trespass and security allegations" and "reeks of technicality."   Entry 1 at p. 2 and 3.   While the court acknowledged Matthews's failure

to comply with his improvement plan, it stated that "[a] reasonable remedy would be, not to terminate Appellant, but to simply compel performance at this time."   *Id.* at p. 3.   The court also made the same comment about Matthew's departure from security protocol and procedures, with the remedy being that the Board should "implement strict security protocol and compel compliance with the same," rather than terminating Matthews.   *Id.* at p. 4.

{¶ 49} Contrary to the trial court's statements, matters like Matthews's prior disciplinary history were not added later to buttress a weak case.   As noted, Matthew's discipline history was mentioned in the superintendent's letter of March 17, 2021, when she stated the grounds on which her termination decision was based.   Matthews would certainly have been aware of his prior discipline history, as he had previously received both verbal and written instructions about these matters.

{¶ 50} During her testimony before the Board, Superintendent Patrick indicated that Matthews had a history of insubordination.   Tr. at p. 74.   One incident involved Matthew's failure to follow an action improvement plan he was given in April 2017.   *Id.* at p. 24 and Ex. E.   The trial court failed to consider the particular content of this plan, which involved substantial issues about Matthews's performance and his relationship with employees he supervised.

{¶ 51} On April 21, 2017, Rick Smith, the then-CTC Superintendent, met with members of the custodial staff, a union representative, and Matthews.   During the meeting, Matthews's staff complained about work projects not getting done as they had previously, a lack of equivalent distribution of workload across the department,

deterioration in the high standard of cleanliness for which CTC was known, and Matthews's failure to pull his weight as a " 'working custodial supervisor.' "  Tr., Ex. E, p. 1.

**{¶ 52}** As a result of the meeting, Smith sent Matthews a letter on April 21, 2017, outlining an action improvement plan.  In addition to referencing the April 21 meeting, Smith mentioned in the letter that two custodial staff members had taken "the unusual step of scheduling a meeting" with Smith during the past few weeks to discuss their frustration over Matthews's preferential treatment of certain staff and their feeling that Matthews was not pulling his weight.   The letter further noted that Smith, the custodial staff, union representatives, and OEA representatives had previously met with Matthews in March 2017 to discuss Matthews's failure to follow protocol in choosing overtime work to be performed.  *Id.*   Due to Matthews's actions, the school district was going to be required to pay more than $1,300 to rectify the overtime issue.  *Id.*

**{¶ 53}** Smith concluded that Matthews needed additional professional training and instructed him to schedule professional development training in "effective employee management and supervisory leadership" as soon as possible and to be registered for any workshops no later than May 12, 2021.  *Id.* at p. 2.  Smith also required Matthews to schedule regular department meetings with staff and stated that Matthews should be prepared to apologize to staff, which "could go a long way in repairing any damages in [Matthews's] relationships and/or loss of credibility" within the custodial department.  *Id.* In addition, Matthews was instructed to follow the negotiated union contract.  *Id.*  *See also* Tr. at p. 24-25.

**{¶ 54}** Shortly thereafter, Smith left his position as superintendent and the new superintendent, Michelle Patrick, began work in July 2017. In the meantime, Matthews had taken no action on the improvement plan; in fact he never took any action. *Id.* at p. 26-27, 136, 138, and 145-147. Matthews broke his leg on July 20, 2017, but this was well after the May deadline had passed. He also made no attempt to follow the improvement plan after he returned to work in October 2017. *Id.* at p. 26-27, 82, 136, 138, and 145-147.

**{¶ 55}** When Patrick first arrived at CTC in July 2017, a situation occurred concerning Matthews's medical leave. Matthews's doctors had concurred with FMLA documentation that Matthews was not to be on campus, was not to work at all, and would return to work with a note. *Id.* at p. 23. Because Matthews had begun coming on campus, Patrick had to call him on August 4, 2017, to explain that he could not do this, as it was a liability issue for the school district. However, after that, Matthews began coming on campus after hours. The district was able to track some of this because Matthews was using his own code to enter; he was also seen on camera. As a result, Patrick sent Matthews a written letter sometime before September 10, 2017, indicating that his actions were insubordinate. *Id.* at p. 24, 64, and 75-77.

**{¶ 56}** The trial court discounted these infractions, stating that they "consisted of nothing more than two short visits to the CTS [sic] premises for purposes that * * * demonstrate a commitment to the job." Entry 1 at p. 3. However, this ignores the fact that immediately after Matthews was instructed not to come on campus, he chose to do so. Whether or not this could have constituted separate grounds for termination, it was

part of Matthew's disciple history and was justly considered in context, as Patrick stated. Tr. at p. 64-65 and 75-77.

{¶ 57} As noted, Matthews was hired as a full-time custodian in 2006 and was promoted to a supervisory position in 2013. Previously, from 2000 to 2006, Matthews had worked as a substitute. Tr. at p. 80. Before Matthews became a supervisor, CTC installed cameras in the office of Matthews's supervisor, Dave Saunders. This was done because a prior supervisor had been going through things on Saunders's desk. That supervisor was terminated for going into Saunders's office and taking things off the desk. *Id.* at p. 45-46.

{¶ 58} An internal investigation of the custodian, Foster, before he was fired in the fall of 2020, indicated that Foster had been conspiring with an unidentified employee in "dishonest conduct, insubordination, and also some nefarious conduct in Mr. Saunders' office, specifically taking photographs, removing papers from the supervisor's office, things of that nature." *Id.* at p. 10. As a result, CTC engaged ESC to do a department-wide investigation to determine who the co-actor was. *Id.* During this investigation, Matthews was asked if he had ever been in Saunders's office with Foster, and he denied it. *Id.* at p. 12. However, video evidence revealed that Matthews had been in Saunders's office with Foster, and they had been looking at a notepad on Saunders's desk. *Id.* at p. 12-13 and Ex. A. The information on the notepad was information that Saunders was keeping; this involved logs of individuals doing and not doing work. Tr. at p. 54. Matthews was not able to provide a reason why he and Foster were in Saunders's office; Saunders also indicated he was not aware the men had been in his office and had

not authorized it.   *Id.* at p. 15.

{¶ 59} In another video, Matthews was shown taking a document from Saunders's desk, putting it in a folder, and leaving with the folder.   Matthews stated that he had never taken a document from Saunders's desk, but the video disproved this.   *Id.* at p. 15-17 and 51-52.   *See also* Ex. B.   Although Saunders was actually in the office at the time, his chair was turned around so that his back was to Matthews, and he did not see Matthews take the document.   Tr. at p. 17 and Ex. B.

{¶ 60} These were only two of the surveillance videos.   Superintendent Patrick indicated she had viewed at least 60 videos.   Tr. at p. 29-30.   Some videos were consistent with Matthews's claim that he would go into Saunders's office to get walkie-talkies or keys or to empty trash.   However, the incidents in videos A and B were never explained.   *Id.* at p. 29-31.

{¶ 61} During the investigation, ESC also discovered through interviews that Matthews had improperly given a substitute employee, who was not a hired individual, unfettered security access to the CTC, which was improper.   A substitute should not have had that access.   *Id.* at p. 18-20, 34-35, and 57.   When Matthews was questioned about this, he said that he had given this individual a set of what he called "substitute keys" and had asked Saunders for a swipe card.   According to Matthews, Saunders told him to give the substitute his own swipe card to use; Matthews then gave the substitute his own key code to alarm and disarm the facilities.   *Id.* at p. 19-20.

{¶ 62} On further investigation, Patrick found that neither Saunders nor another individual Matthews named had told Saunders to let the substitute use the card; in fact,

as soon as Saunders became aware of what had occurred, he specifically asked Matthews to change his code because CTC did not allow substitutes free access to the building. Tr. at p. 20-21, 34-35, and 61-62. Matthews did not comply with Saunders's directive to change the code, however. *Id.* at p. 61.

{¶ 63} During the Board hearing, Matthews testified that Saunders told him after he returned to work in October 2017 that the action plan had been handled wrongly and that he did not have to complete the plan. *Id.* at p. 113-115. Matthews also stated that Saunders had never asked him to change his access code and denied that Patrick had ever told him to stay off campus. *Id.* at p. 116-117, 118-119. Matthews's testimony was contradicted by the evidence, including the written documents and videos.

{¶ 64} The trial court concluded that the Board had deprived Matthews of the opportunity to cross-examine Saunders at the hearing, and it also discounted the Board's claim about the security issue as "unsubstantiated, unreliable hearsay." Entry 1 at p. 4. However, the court's conclusions were not supported by sound reasoning. In the first place, Matthews did not object to any "hearsay" during the board hearing, nor was there any indication that he either asked for Saunders to testify or tried to call Sanders as a witness. Thus, the record lacks any evidence to support a finding that the Board prevented Matthews from questioning anyone or providing any witnesses or evidence he wished. And, by submitting only his own testimony, Matthews gave the Board the option not to believe his account. The Board, in unanimously deciding on termination, clearly did not find Matthews credible.

{¶ 65} Furthermore, "[t]he Ohio Supreme Court has held that administrative

agencies are not bound by the rules of evidence applied in court." *Cleveland v. Posner*, 193 Ohio App.3d 211, 2011-Ohio-1370, 951 N.E.2d 476, ¶ 27 (8th Dist.), citing *Simon v. Lake Geauga Printing Co.*, 69 Ohio St.2d 41, 44, 430 N.E.2d 468 (1982). *Accord Toney v. City of Dayton*, 2017-Ohio-5618, 94 N.E.3d 179, ¶ 13 (2d Dist.). "As a result, evidence that would be excluded as hearsay in a civil or criminal case may be admitted and considered under the relaxed standards of administrative proceedings." *HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 13.

**{¶ 66}** The only witnesses who testified at the Board hearing were Patrick (whom the Board believed) and Matthews (whom the Board did not believe). Both witnesses testified about statements that Saunders made to them outside the proceedings, meaning that Matthews's statements as to what Saunders told him were also hearsay. *See* Evid.R. 801(C) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement"). No sound reasoning exists for the trial court's choice to disregard the Superintendent's testimony as "unsubstantiated, unreliable hearsay," while accepting Matthew's hearsay evidence. Entry 1 at p. 4.

**{¶ 67}** As to Matthew's claim about Saunders's absence at the Board hearing, we again note that "[c]onfrontation and cross-examination are not, however, absolute prerequisites to predeprivation due process." *Ohio Assn. of Pub. School Emps.*, 68 Ohio St.3d at 177, 624 N.E.2d 1043.

**{¶ 68}** Furthermore, as to post-termination proceedings, there again is no such due process right. However, R.C. 2506.03(B) does allow trial courts to hear appeals based

on the transcript and additional witnesses if circumstances listed in R.C. 2506.03(A)(1)-(5) exist. One such situation arguably existed here, i.e., R.C. 2506.03(A)(3), which allows additional witnesses where "[t]he testimony adduced was not given under oath." In the case before us, the Board recorded the proceedings and provided a transcript, but did not swear in the witnesses. Matthews did not object during the Board hearing to this failure; instead, he indicated a desire to proceed "informally." Tr. at p. 29. Thus, Matthews may have had grounds to ask the trial court to consider additional evidence and to call Saunders to testify.

{¶ 69} The trial court may have denied a request to add evidence, as "failure to object to unsworn testimony waives the right to appeal on such a ground." *Penewit v. Spring Valley Bd. of Zoning Appeals*, 2d Dist. Greene No. 2019-CA-6, 2019-Ohio-3200, ¶ 3, fn. 1, citing *Stores Realty Co. v. City of Cleveland, Bd. of Bldg. Standards & Bldg. Appeals*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). Nonetheless, Matthews's failure either to ask the trial court to add Saunders's testimony or to object during the board hearing casts doubt on Matthew's claim that Saunders supported his position or excused his behavior. Certainly, if Saunders' testimony were favorable, Matthews would have tried to present it.

{¶ 70} In his brief, Matthews argues that the Board cited incorrect authority (pertaining to R.C. Chap. 119 appeals) when it claimed the trial court was required to defer to the Board's fact-finding. Matthews Brief, p. 9. According to Matthews, in R.C. Chap. 2506 appeals, trial courts do not presumptively defer to an agency's resolution of evidentiary conflicts. *Id.*

{¶ 71} As a preliminary point, the Supreme Court of Ohio has said that R.C. Chap. 119 is "analogous" to R.C. Chap. 2506. *Kisil*, 12 Ohio St.3d at 35, 465 N.E.2d 848, citing *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 407 N.E.2d 1265 (1980). *Kisil* involved an appeal under R.C. 2506.01, and *Conrad* was an appeal brought under R.C. 119.12. *Id*. at 34-35.

{¶ 72} These types of appeals are similar in most respects, with a few differences. Both allow additional evidence in trial courts, but the ground in R.C. 119.12(K) is somewhat less liberal, as it says that "the court may grant a request for the admission of additional evidence when satisfied that the additional evidence is newly discovered and could not with reasonable diligence have been ascertained prior to the hearing before the agency." In contrast, R.C. 2506.03(A)(1) though (5) allow new evidence in "limited circumstances of procedural defects at the administrative agency level." *Posner*, 193 Ohio App.3d 211, 2011-Ohio-1370, 951 N.E.2d 476, at ¶ 41.

{¶ 73} Unlike R.C. 2506.04. R.C. 119.12 does not use the word "preponderance" when referring to weighing of the evidence. However, similar to R.C. 2506.04, in R.C. 119.12 appeals, the "court must give consideration to the entire record before the [agency], including all evidence offered before the board, and such additional evidence as the court may admit, and *must appraise all such evidence as to the credibility of witnesses, the probative character of the evidence and the weight to be given it*, and, if from such a consideration it finds that the board's order is not supported by reliable, probative and substantial evidence and is not in accordance with law, the court is authorized to reverse, vacate, or modify the order of the board." (Emphasis added.)

*Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 131 N.E.2d 390 (1955), paragraph one of the syllabus, citing R.C. 119.12. Therefore, in both situations, trial courts have some ability to weigh evidence.

**{¶ 74}** Moreover, the Supreme Court of Ohio has stressed that "the standard of review prescribed by R.C. Chapter 2506 is deferential on issues of fact, though it is generally plenary on issues of law." *MacDonald v. Shaker Hts. Bd. of Income Tax Rev.*, 144 Ohio St.3d 105, 2015-Ohio-3290, 41 N.E.3d 376, ¶ 13. *See also Stumpff v. Riverside Bd. of Zoning Appeals*, 2d Dist. Montgomery No. 28589, 2020-Ohio-4328, ¶ 11 (in R.C. Chap. 2506 appeal, noting the "due deference" to be given agencies and a trial court's inability to "blatantly substitute" its judgment for that of an agency); and *Bales v. City of Dayton*, 2d Dist. Montgomery No. 15668, 1996 WL 685785, *2 (Nov. 8, 1996) (in R.C. Chap. 2506 appeal, commenting that a trial "court must give due deference to the administrative agency's resolution of evidentiary conflicts where the conflicting testimony is of approximately equal weight").

**{¶ 75}** The reasons for due deference are obvious. While trial courts may allow additional evidence in limited circumstances, that did not occur here. As a result, the trial court reviewed only a hearing transcript and a few short videos (just as we have). While our review is admittedly more constrained than the trial court's, we have stressed in many situations that actual triers of fact are best suited to judge credibility, given that they see and hear witnesses testify. *E.g., Nuwin Realty, LLC v. City of Englewood*, 2017-Ohio-480, 84 N.E.3d 346, ¶ 73 (2d Dist.), quoting *Conrad*, 63 Ohio St.2d at 111, 407 N.E.2d 1265 (a trial "court should defer to the determination of the administrative body,

which, as the factfinder, had the opportunity to observe the demeanor of the witnesses and weigh their credibility"). The appeal in *Nuwin* was brought under R.C. 2506.01. *Id.* at ¶ 22. *See also Hobbs v. Pickaway-Ross Career & Technology Ctr. Bd. of Edn.*, 4th Dist. Ross No. 21CA3746, 2022-Ohio-921, ¶ 27 (stressing that the board "had authority to assess the credibility of the [conflicting statements] and determine, which, if either, was reliable or credible").

{¶ 76} Here, the trial court gave no deference at all to the Board's credibility decisions or to its resolution of evidentiary conflicts. Furthermore, as indicated previously, the trial court at several points expressed its view of what discipline the Board should have imposed. This was not within the trial court's purview.

{¶ 77} Accordingly, we agree with the Board that the trial court erred in failing to accord any deference to the Board's findings and in blatantly substituting its judgment for that of the Board.

{¶ 78} The Board's final argument in this context is that the trial court erred in stating that, while Matthews engaged in misconduct and should be given some amount of discipline, "barring criminal or other egregious conduct, the reasonable course of action, when dealing with a long-term employee, is to continue to engage [in an improvement plan] process, not to terminate the employee." *See* Entry 1 at p. 6. According to the Board, the trial court usurped the function of the legislature, which has provided specific grounds for termination of nonteaching employees and does not require criminal or egregious conduct. Board's Brief, p. 9.

{¶ 79} As noted, R.C. 3319.081(C) allows nonteaching employees to be

terminated for various reasons, including "violation of written rules and regulations as set forth by the board of education or for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, or any other acts of misfeasance, malfeasance, or nonfeasance."

{¶ 80} The statute is not ambiguous and does not require criminal or "egregious" conduct as the trial court stated. A nonteaching employee "is generally subject to termination only for cause." *State ex rel. Singer v. Fairland Local School Dist. Bd. of Edn.*, 151 Ohio St.3d 594, 2017-Ohio-8368, 91 N.E.3d 732, ¶ 4, citing R.C. 3319.081(C). Cause for discharge has been found for malfeasance simply where a custodian had a contentious disagreement with a teacher about tape on the floor of her classroom, which interfered with his sweeper. In this situation, the court of appeals concluded that the custodian had "acted in a hostile, confrontational manner when speaking to the teacher, and [this] could support a claim of malfeasance (wrongdoing)." *Hobbs*, 4th Dist. Ross No. 21CA3746, 2022-Ohio-921, at ¶ 27.

{¶ 81} Accordingly, we agree with the Board that the trial court improperly substituted its judgment for that of the Board, erred in failing to accord any deference at all to the Board's factual findings, and applied a standard that is absent from R.C. 3319.081. The Board's second assignment of error therefore is sustained.

IV. Remaining Assignments of Error

{¶ 82} The Board's remaining three assignments of error are as follows:

The Trial Court Erred as a Matter of Law in Awarding Lost Wages to

Matthews in a R.C. 3319.081 Appeal.

The Trial Court Erred in Awarding Lost Wages When Matthews Failed to Offer Anything Other Than a "Rough Estimate" of Lost Wages in the Hearing on the Subject; and

The Trial Court Erred in Awarding Lost Wages When Matthews Made No Genuine Effort to Mitigate His Lost Wages as Required by Ohio Law.

**{¶ 83}** These assignments of error all deal with the trial court's decision on damages. However, since we are reversing the court's judgment on the termination, any discussion of damages or the court's authority to award them is moot. Consequently, the remaining three assignments of error are overruled as moot.

**{¶ 84}** Under App.R. 12(B), "[w]hen the court of appeals determines that the trial court committed error prejudicial to the appellant and that the appellant is entitled to have judgment or final order rendered in his favor as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and render the judgment or final order that the trial court should have rendered, or remand the cause to the court with instructions to render such judgment or final order." Pursuant to this authority, we will reverse the judgment and remand the case with instructions for the trial court to affirm the Board's decision terminating Matthews's employment. *E.g.*, *Wiant v. City of Springfield, Ohio*, 2d Dist. Clark No. 97-CA-0069, 1998 WL 309834, *7 (May 15, 1998); *Lelak v. Lelak*, 2d Dist. Montgomery No. 29308, 2022-Ohio-3458, ¶ 132.

V. Conclusion

Having sustained the first and second assignments of error and having overruled the third, fourth, and fifth assignments of error as moot, the judgment of the trial court is reversed. Pursuant to App.R. 12(B), this case is remanded to the trial court with instructions to affirm the Board's decision to terminate Matthews.

. . . . . . . . . . . . .


TUCKER, J. and EPLEY, J., concur.